Daniel J. Sullivan et al. *v.* County of Bucks and Neshaminy Water Resources Authority. Neshaminy Water Resources Authority, Appellant.

North Wales Water Authority and North Penn Water Authority *v.* Neshaminy Water Resources Authority and County of Bucks and County of Montgomery and Philadelphia Electric Company. Neshaminy Water Resources Authority, Appellant.

Daniel J. Sullivan and Philadelphia Electric Company, North Penn Water Authority and North Wales Water Authority *v.* County of Bucks and Neshaminy Water Resources Authority. County of Bucks, Appellant.

Argued June 5, 1985, before President Judge CRUMLISH, JR., and Judges ROGERS, CRAIG, MACPHAIL, DOYLE, BARRY and COLINS.

*Gordon W. Gerber,* with him, *John F. Flaherty, Jr., Fred T. Magaziner, Lois Reznick, Philip M. Kruger* and *George G. O'Brien, Dechert, Price & Rhoads,* and *Robert H. Yaroschuk,* for appellant/appellee, Neshaminy Water Resources Authority.

Richard M. Rosenbleeth, with him, Glenn S. Gitomen, William E. Taylor, III, James W. McNamara and Robert J. Sugarman, for appellant/appellee, Bucks County.

Andrew C. Gay, with him, T. J. Scully, Gay and Chacker, for appellee/appellant, Daniel J. Sullivan et al.

Bernard Chanin, with him, Howard Gittis and Jeffrey Saltz, Wolf, Block, Schorr & Solis-Cohen, and Robert W. Valimont, Power, Bowen & Valimont, for appellee/appellant, Philadelphia Electric Company.

Frederick M. Wetz, for appellee/appellant, Montgomery County.

Jeremiah J. Cardamone, with him, Ann Thornburg Weiss, Timoney, Knox, Hasson & Weand, and Joseph Goldberg, Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, for appellees, North Wales Water Authority and North Penn Water Authority.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., October 11, 1985:

For our consideration and resolution herein are litigous challenges to the construction of facilities to supply water for cooling a nuclear generating station in Limerick, Montgomery County, Pennsylvania, and meeting the citizens' requirements of Bucks and Montgomery Counties.

This construction has inspired widespread public discussion and disagreement. Notwithstanding that vocal, philosophical and/or political dichotomy, we are obliged and intend to confine our consideration to the merits of the legal issues presented below.

Bucks County and the Neshaminy Water Resources Authority (NWRA) appeal a Bucks County Common Pleas Court order denying their exceptions

to its adjudication and decree nisi which entered a verdict against them and in favor of the Philadelphia Electric Company (PECO) and the North Penn (NP) and North Wales (NW) Water Authorities.

Daniel J. Sullivan, a taxpayer, appeals a Bucks County Common Pleas Court order granting the preliminary objections of Bucks County and NWRA and dismissing his third amended complaint.

The purpose of the Point Pleasant water diversion project is to construct a system by which Delaware River water could be withdrawn by the Point Pleasant Pumping Station and pumped through a combined transmission main to the Bradshaw Reservoir and Pump House (Bradshaw) where (1) water for public use by Bucks and Montgomery Counties would flow through the north branch transmission main and along the Neshaminy Creek to the north branch water treatment plant where it would be pumped, in part, to NP and NW and (2) supplemental cooling water for PECO's Limerick nuclear generating station would be pumped through the east branch transmission main and flow along the Perkiomen Creek to the Perkiomen Pump House where it would be withdrawn and pumped to Limerick. Supplemental cooling water is necessary because PECO is prohibited from using Schuylkill River water for several months each year.

PECO and NWRA entered into a Construction and Operation Agreement by which NWRA agreed to construct and maintain the Point Pleasant Pumping Station and combined transmission main, PECO assumed responsibility for constructing Bradshaw (where it agreed to store and release water to flow through the north branch transmission main, at no cost to NWRA) and NWRA assumed sole responsibility for the north branch transmission main. The agreement provides that the project's ultimate ca-

pacity is to be 95 million gallons per day (mgd), 49 mgd for NWRA and 46 mgd for PECO. To the extent necessary to insure operation and maintenance of the Point Pleasant Pumping Station and combined transmission main, this agreement provides for assignment by NWRA to Bucks County. The agreement was executed by the required majority of the Bucks County Commissioners.

NWRA, Bucks County and Montgomery County entered into a Water Sales Agreement by which Bucks County agreed to construct (or cause to be constructed by NWRA) the Point Pleasant Pumping Station and combined transmission main and NWRA agreed to construct the north branch transmission main. This agreement provides that 46 mgd is reserved for PECO, in accordance with the Construction and Operation Agreement, while 29.4 mgd is reserved for Montgomery County and 19.6 mgd is reserved for Bucks County. The trial court found that the water reserved for Montgomery County was intended primarily for the benefit of NP and NW, both of which entered into contracts for the water with Montgomery County simultaneously with the execution of the Water Sales Agreement. Montgomery County itself operates no water treatment or delivery facilities.

Later, Bucks County purported to terminate its Construction and Operation Agreement with PECO, demanded that NWRA stop construction of the Point Pleasant Pumping Station and combined transmission main and purported to terminate its obligation to supply water to Montgomery County. Construction recommenced after a thirty-day moratorium. However, the Bucks County Commissioners next passed Ordinance No. 59 which purported to require NWRA to convey the Point Pleasant project to Bucks County (apparently so that they could stop the project).

Thereafter, the NWRA ordered a second suspension of construction and passed a resolution questioning the validity of the Construction and Operation and Water Sales Agreements. Finally, Bucks County passed a resolution directing NWRA to delete the project from its water supply system.

The trial court's adjudication ordered that (1) NP and NW be assigned ownership of and complete the north branch transmission main and water treatment plant and that portion of the western transmission facilities necessary to transport water to them and that NP and NW reimburse Bucks County and NWRA for all properly incurred costs of these facilities, (2) NWRA complete construction of the Point Pleasant Pumping Station and the combined transmission main and (3) Bucks County comply with its contractual obligations, under the Construction and Operation and Water Sales Agreements, to insure completion of the Point Pleasant Pumping Station and the combined transmission main.

Our scope of review in equity matters is limited to a determination of whether the Chancellor committed an error of law or abused his discretion. *Sack v. Feinman*, 489 Pa. 152, 413 A.2d 1059 (1980). We will not disturb his findings unless they are unsupported by the evidence or demonstrably capricious. *Harrisburg School District v. Pennsylvania Interscholastic Athletic Association*, 453 Pa. 495, 309 A.2d 353 (1973).

The major contentions of Bucks County and NWRA are that (1) the Construction and Operation and Water Sales Agreements are invalid, not binding and unenforceable, (2)(a) PECO is not a third-party beneficiary to the Water Sales Agreement, despite its relationship to the Construction and Operation Agreement, and therefore has no standing to enforce

it and (b) NP and NW are not third-party bene-
ficiaries to the Water Sales Agreement and therefore
have no standing to enforce either agreement, (3)
Bucks County and NWRA have breached neither
agreement, (4) specific performance is not the appro-
priate relief, (5) NP and NW are not entitled to
assume ownership of and complete the north branch
transmission main and water treatment plant and
that portion of the western transmission facilities nec-
essary to transport water to them and (6) President
Judge GARB improperly refused to recuse himself.

Sullivan argues that the common pleas court erred
by granting Bucks County and NWRA's preliminary
objections and dismissing his third amended com-
plaint.

We will examine each legal issue seriatim.[1]

## VALIDITY

Bucks County and NWRA contend that the project
will predominantly serve the private interests of
PECO,[2] allowing it to thwart the public interest of
Bucks County. However, we agree with the trial
court's holding that the agreements serve important
and legitimate public purposes, specifically supplying
water to Bucks *and* Montgomery Counties, and there-
fore are not invalid or *ultra vires* under the Munic-

---

[1] Due to our resolution of these legal questions, it is unneces-
sary to address the collateral contentions of Bucks County and
NWRA.

[2] Bucks County specifically argues that it will receive *no bene-
fit* from the project. However, our review of the record reveals
that Bucks County would benefit but for the refusal of its water
authorities to accept water from the project. Indeed, the trial
court found that the capacities reserved in the Construction and
Operation Agreement most accurately reflected the parties' water
needs. Our review of the record reveals that this finding is sup-
ported by substantial evidence in the form of the project's design
engineer's testimony.

ipality Authorities Act of 1945 (Act),[3] because they benefit the public, and not primarily a private endeavor. *See Price v. Philadelphia Parking Authority*, 422 Pa. 317, 333, 221 A.2d 138, 147 (1966) (the parking authority was empowered to act only for the public benefit and could not employ its resources for the primary and paramount benefit of a private endeavor). Bucks County and NWRA rely heavily on *Price* to support their position that PECO would receive the primary benefits of the project. In that case, Philadelphia was barred from the joint construction of a parking garage with an apartment building developer because the developer, not the public, was receiving the primary benefit. However, this case is distinguishable from *Price*. Here, the amount of water reserved for PECO (46 mgd) is less than that to be used by Bucks and Montgomery Counties.[4] Moreover, the sale of water to PECO is critical to the viability of Bucks County's entire water management program.[5] Finally, unlike the developer in *Price*, PECO operates in the public sector. Even the water received by PECO would be devoted to generating electricity for use of the general public.

Bucks County and NWRA also argue that the agreements grant PECO, NP and NW an improper

[3] Act of May 2, 1945, P.L. 382, *as amended*, 53 P.S. §§301-22.

[4] Bucks County and NWRA's argument that the project does not provide "public benefit" because 24.4 mgd, of the 49 mgd going to Bucks and Montgomery Counties, is reserved for Montgomery County is meritless. Supplying water to either county provides a *public* benefit. NWRA, as a municipal authority, is an agency of the *Commonwealth* and acts to benefit the *people of the Commonwealth*. Section 4A of the Act, 53 P.S. §306A.

[5] The project is part of Bucks County's water supply system which itself is part of its water management program. PECO is a major purchaser of water from NWRA and the sale of water is necessary for the retirement of the public bonds sold to finance the water management program.

loan. Again, we agree with the trial court's holding that the agreements are predominantly for public purposes and, therefore, do not violate the constitutional prohibition, against a government's use of its credit to finance a private entity.[6]

Bucks County and NWRA further contend that the Construction and Operation Agreement, in effect, allows PECO to exercise governmental powers. We hold, however, that while it allows PECO *limited* input[7] concerning the implementation of Bucks County's

---

[6] PA. CONST. art. IX, §9 provides:

The General Assembly shall not authorize any municipality or incorporated district to become a stockholder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual.

This provision has been construed to mean that a municipality may not lend its credit to a purely private enterprise. *Rettig v. Board of County Commissioners*, 425 Pa. 274, 228 A.2d 747 (1967).

[7] The Construction and Operation Agreement does not delegate to PECO the right to construct or require construction according to its plans and specifications. Under this agreement, PECO is only empowered to (1) approve additions or improvements and their associated costs in writing before charges to it may be increased and (2) make recommendations concerning these additions and improvements if they would adversely affect its supply of water. Delegation merely of details of administration is not constitutionally prohibited. *Evans v. West Norriton Township Municipal Authority*, 370 Pa. 150, 87 A.2d 474 (1952). Moreover, even these recommendations need not be followed if they would require the NWRA to violate its obligation to comply with all public bidding requirements and any applicable laws.

*Weatherly Borough v. Warner*, 148 Pa. Superior Ct. 557, 25 A.2d 831 (1942) (curbing ordinance held to be an unconstitutional delegation of the Borough's power), is distinguishable from this case. There the Superior Court held that the ordinance went beyond delegation of administrative tasks, seeking to "delegate to others the authority, not only to decide upon the materials to be used, the manner of performing the work and the character of the finished result *but also to determine what curbing should be constructed.*" *Id.* at 559, 25 A.2d at 832 (emphasis added).

"proprietary" contracts,[8] it permits no interference with discretionary governmental functions and, therefore, constitutes *no* improper delegation of governmental authority as proscribed in PA. CONST. art. III, §31.[9]

---

[8] As recognized in the bond indenture documents for the water management program, the project is only one small part of the program. Although the program could remain viable without the project, the project is a proprietary step toward both the fiscal and substantive realization of the program. "Property employed by a municipality in furnishing water to its inhabitants is not used for governmental purposes, and in its ownership and operation the municipality acts in its proprietary capacity." *Pleasant Hills Borough v. Jefferson Township*, 375 Pa. 431, 437, 100 A.2d 720, 723 (1953).

We reject the argument that the Water Sales Agreement is invalid because it was entered into by the predecessors of the present Board of County Commissioners. In *MacCalman v. Bucks County*, 411 Pa. 316, 191 A.2d 265 (1963), our Supreme Court held that if, as here, the County's commitment is characterized as proprietary, the Commissioners have the power to obligate themselves beyond the tenure of a particular Board. Further, the trial court acknowledged the urgent need for water now experienced by NP and NW as well as PECO. Our Supreme Court stated that:

> [Even if an agreement] is 'deemed to constitute a contractual impairment or limitation upon future county commissioners in a legislative or governmental function, . . . considerations of *urgency and necessity*, especially when coupled with the stipulated public interest and absence of bad faith or ulterior motivation, should permit the commitment to be sustained as an exception to the general rule' . . . that a legislative body, or municipal board having legislative authority, may not properly bind its successors and may not legally enter into a contract which will extend beyond the term for which the members of the body were elected.

*Id.* at 321, 191 A.2d at 267 (quoting lower court) (emphasis added; original emphasis omitted).

[9] This provision of the Constitution provides:

> The General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or

We hold that both the Construction and Operation and the Water Sales Agreements are valid, binding and enforceable.[10]

## Standing

We hold that PECO, NP and NW have third-party beneficiary standing to enforce both interrelated agreements under the concepts of *Guy v. Liederbach*, 501 Pa. 47, 459 A.2d 744 (1983).

---

otherwise, or to levy taxes or perform any municipal function whatever.

This provision of the Constitution has been held to apply to municipal corporations as well as agents of the State. *See Wilson v. Philadelphia School District*, 328 Pa. 225, 195 A. 90 (1937) and *Weatherly Borough*.

We hold that the Water Sales Agreement does not surrender control over governmental functions to Montgomery County, NP or NW. That agreement specifically gives the power to control and construct the project to NWRA. Moreover, PA. CONST. art. III, §31 does not prohibit delegation of control over a public project from one municipal entity to another.

Further, we find no merit in the contention that NWRA's promise to build violates this provision. Merely contracting to build the project delegates no authority to anyone.

[10] Bucks County and NWRA argue that they are released from their obligation to perform by the "force mageure" provision of the Construction and Operation Agreement, which reads:

A party shall not be considered in default in the performance of its obligations hereunder, or any of them, to the extent that performance of such obligations, or any of them, is prevented or delayed by any cause, existing or future, which is beyond the reasonable control of such party. . . .

However, it simply cannot be said that prevention or delay in the performance of the obligations of Bucks County and NWRA, based on their disinclination to proceed with the project, is beyond their reasonable control. Despite NWRA's contentions, Bucks County is not totally outside the Construction and Operation Agreement and its refusal to construct will not exonerate NWRA. Bucks County's precise duties under the Construction and Operation Agreement will be discussed under *BREACH*.

Our Supreme Court, in *Spires v. Hanover Fire Insurance Co.*, 364 Pa. 52, 70 A.2d 828 (1950), held that to be a third-party beneficiary entitled to recover on a contract, both parties to the contract must so intend and must indicate that intention in the contract. However, in *Guy,* our Supreme Court recognized that it is unlikely that a beneficiary of a will could ever bring suit under the *Spires* requirements. *Spires* was overruled by *Guy* "to the extent that it states the *exclusive* test for third party beneficiaries." *Guy,* 501 Pa. at 60, 459 A.2d at 751 (emphasis added). Referencing the RESTATEMENT (SECOND) OF CONTRACTS §302 (1979), our Supreme Court in *Guy* set forth a "two part test for determining whether one is an intended third party beneficiary: (1) the recognition of the beneficiary's right must be 'appropriate to effectuate the intention of the parties,' and (2) the performance must 'satisfy an obligation of the promisee to pay money to the beneficiary' or 'the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.' " *Id.* This *alternative* test, rather than requiring a mutual intention manifested in the contract, "leaves discretion with the trial court to determine whether recognition of third party beneficiary status would be 'appropriate.' " *Id.* 60-61, 459 A.2d at 751.

With respect to the Water Sales Agreement, the *Spires* test has been met because the parties *mutually intended.* as *manifested* in the agreement, that NP and NW would be beneficiaries of Montgomery County's water purchase (in which it had no direct interest)[11]

---

[11] The Water Sales Agreement makes specific reference to NP and NW. Paragraph 14 provides that Montgomery County will not sell water to any municipality or municipal authority or private water company or water utility within Bucks County without the written approval of Bucks County,

and that PECO would be a major water purchaser. Moreover, the alternative *Guy* test has also been met because the trial court determined that recognition of the third-party beneficiary status of PECO, NP and NW was appropriate and the circumstances indicate that the promisee (Montgomery County) intended to give them the benefit of the promised performance.[12]

except that it may sell water for use in those municipalities which are presently being serviced by a municipal authority located in Montgomery County presently serving municipalities in Bucks County. In no event, however, shall MONTGOMERY sell water to those Authorities to enable them to extend or expand their existing service areas into BUCKS said service areas are [sic] shown on exhibit 6 without written consent of BUCKS, which consent shall not be unreasonably withheld.

This provision clearly applies to NP and NW because, as found by the trial court, they are the only municipal authorities in Montgomery County which service municipalities in Bucks County. Exhibit 6, which is specifically referred to in that paragraph, is a map of the portion of Bucks County which is serviced by NP and NW. Both are specifically identified on that exhibit.

[12] Circumstances which the trial court found to indicate that Montgomery County intended to give NP and NW the benefit of the promised performance include (1) Montgomery County operates no treatment, delivery or sales facilities and had to be contracting for someone, (2) NP and NW entered into contracts for water with Montgomery County simultaneously with the execution of the Water Sales Agreement, (3) the Water Sales Agreement was appended as an exhibit to the contracts between Montgomery County, NP and NW and (4) NP and NW were part of the project's planning and development process from a very early stage, in order to secure a percentage of the water it would supply and both Bucks County and NWRA participated with them in these endeavors (once the discussions were halted while NP and NW temporarily reconsidered their positions).

Circumstances indicate that Montgomery County intended to give PECO the benefit of the promised performance insofar as Montgomery secured Bucks County's promise to construct (or cause to be constructed by NWRA) the project and to reserve 46 mgd for PECO.

With respect to the Construction and Operation Agreement, the *Spires* test has been met because the parties *mutually intended,* as *manifested* in the agreement, that NP and NW would be beneficiaries.[13] Further, the alternative *Guy* test has also been met because the trial court determined that recognition of the third-party beneficiary status of NP and NW was appropriate and the circumstances indicate that the promisee (PECO) intended to give them the benefit of the promised performance.[14]

The standing of PECO, NP and NW to enforce these agreements clearly follows from their third-party beneficiary status. *See Fitzgerald v. Kwaterski,* 318 Pa. 494, 178 A. 385 (1935). *See also* RESTATEMENT (SECOND) OF CONTRACTS §307 (1979).

[13] Bucks and NWRA contend that NP and NW cannot be third-party beneficiaries to the Water Sales Agreement because they separately contracted for water with Montgomery County. We disagree. Without the Water Sales Agreement, these separate contracts would be meaningless. NP and NW are more than incidental beneficiaries of this Bucks County/NWRA-Montgomery County agreement, for its end product (water) was always intended to be used by NP and NW. Our review of the record supports the trial court's finding that their water needs were the sole reason for the existence of the Water Sales Agreement and, therefore, they must be classified as intended beneficiaries capable of asserting contractual rights. *See Department of Transportation v. Bethlehem Steel Corp.,* 28 Pa. Commonwealth Ct. 214, 368 A.2d 888 (1977).

[13] The *Spires* Court explained that "a third party beneficiary may be in contemplation without being specifically or individually designated." *Spires,* 364 Pa. at 57 n.*, 70 A.2d at 831 n.*. Given the major role that the trial court found NP and NW played in the project's planning and development process, we hold that they were in contemplation when NWRA reserved 49 mgd of the project's ultimate capacity in the Construction and Operation Agreement.

[14] The very fact that NP and NW were, from a very early stage, part of the project's planning and development process with PECO indicates that PECO intended to give them the benefit of the promised performance.

## Breach

Initially, Bucks County contends that its execution of the Construction and Operation Agreement, providing for assignment to insure *operation and maintenance* of the project, does not obligate it under that agreement's *construction* provisions or effect a present assignment. We agree. The trial court held that Bucks County is bound only to the extent that its acceptance of the assignment obligated it to do certain things under the provisions of the agreement. Its adjudication merely orders Bucks County to do all things which it is contractually obligated to do so that the project, as contemplated by the agreement, may be completed. Nonetheless, to the extent that the NWRA is its creature,[15] Bucks County has a duty not only to resist any impediment to NWRA's contractual obligations[16] but also to insist on the means to carry out the Construction and Operation Agreement. These duties are especially clear given Bucks County's obligations under the Water Sales Agreement.

It is abundantly clear that Bucks County and NWRA breached both agreements by virtue of their failure to proceed expeditiously and their declared intention not to complete the project.[17]

---

[15] NWRA is a municipal authority created as an independent agency by the Bucks County Commissioners.

[16] A party to a contract cannot avoid its conditional contractual obligations by causing the failure of the condition. *See Commonwealth v. Transamerica Insurance Co.*, 462 Pa. 268, 274, 341 A.2d 74, 77 (1975).

[17] It is important to recognize that the trial court did not invade any area of discretionary executive or legislative function, but merely acted to redress the breach of these agreements. In *Delaware River Port Authority v. Thornburgh*, 500 Pa. 629, 459 A.2d 717 (1983), our Supreme Court refused to order the General Assembly *to meet its statutory obligations,* under the Delaware River

Although clouded by a myriad of procedural and preliminary contentions, the major argument of Bucks County and NWRA is that they undertook the project in their governmental capacity and, therefore, have the right to withdraw from or terminate the project. Their theory is that a government of the people must be able to respond to the changing will of the people. However, we are more persuaded by the contention that we must presently recognize the need for the reliability and certainty of contractual relations required to insure the very stability of government. "A municipality is not at liberty to avoid its contractual obligations *merely because it deems it to be for the benefit of its citizens to do so.*" *Allegheny County v. Pennsylvania Public Utility Commission,* 192 Pa. Superior Ct. 100, 114, 159 A.2d 227, 234 (1960) (emphasis added). As early as 1790, this concept was recognized by Alexander Hamilton, then Secretary of the Treasury, who observed that "[e]very breach of the public engagements, whether from choice or necessity, is, in different degrees, hurtful to public credit" and that "fundamental principles of good faith . . . dictate that every practical exertion ought to be made, scrupulously to fulfil the engagements of the Govern-

---

Port Authority Compact, by fulfilling an alleged agreement to construct a highway providing access to a bridge built and operated pursuant to the compact. It held that *this* relief would impermissibly affect the exercise of the General Assembly's legislative power to make, alter or repeal laws. Such is not the situation in this case. The petition in *Delaware River Port Authority* sought "to restrain appellees' alleged interference with the performance of the Authority's statutory duties and to enforce appellees' compliance with their statutory duties under the interstate compact, *not merely* to compel appellees' performance of their duties under a construction contract." *Id.* at 634, 459 A.2d at 719 (emphasis added). In this case, PECO, NP and NW seek *merely* to compel Bucks County and NWRA to perform their duties under the agreements in question.

ment." *First Report on the Public Credit,* Treasury Department, January 9, 1790. Indeed, our Supreme Court adopted Alexander Hamilton's observation that "[w]hen a government enters into a contract with an individual, it deposes, as to the matter of the contract, its constitutional authority, and exchanges the character of legislator for that of a moral agent, with the same rights and obligations as an individual. Its promises may be justly considered as excepted out of its power to legislate, unless in aid of them." *Philadelphia v. Fidelity-Philadelphia Trust Co.,* 358 Pa. 155, 168, 56 A.2d 99, 104-05 (1947) (quoting Alexander Hamilton, *Second Report on the Public Credit,* Treasury Department, January 20, 1795). This observation is equally applicable to national, state or municipal government. *Id.* at 168, 56 A.2d at 104.

Having found that these agreements are not *ultra vires* and because PECO, NP and NW relied on them, we also upheld the trial court's conclusion that Bucks County and NWRA are estopped from denying their resulting contractual obligations.[18] Estoppel is an

---

[18] Bucks County argues that it has not breached its contractual obligations because (1) it exercised its power under Section 4A of the Act, 53 P.S. §306A, to "specify" the projects to be undertaken by the NWRA, by passing the resolution directing NWRA to withdraw and (2) having done so, it is not in breach of its obligations because NWRA is unable to go forward. This argument is unpersuasive. The power to specify undertakings does not imply the power to withdraw approval. Bucks County cannot, directly or indirectly, legislate away responsibility for its proprietary contracts. *See Fidelity-Philadelphia Trust Co.*

Bucks County further contends that, because it has the power to approve certain aspects of the project pursuant to Section 1.02 of the Agreement and Lease (an agreement between Bucks County and NWRA regarding the total Water Management program), is free to unilaterally withhold or withdraw such approvals and thus vitiate the Water Sales and Construction and Operation Agreements. There is no merit to this suggestion. Under Section 1.05(a) of the Agreement and Lease, Bucks County is *obligated* to consider the

equitable doctrine. Where, as here, parties proceed in good faith reliance upon the other parties' contractual obligations, the doctrine will preclude the other parties from denying their obligations. The fact that Bucks County is a governmental agency, and NWRA is its creature, is irrelevant. *See Fidelity-Philadelphia Trust Co.* and *Henry Shenk Co. v. Erie Co.,* 319 Pa. 100, 178 A. 662 (1935). A municipality, like a private corporation, is subject to the doctrine of estoppel. *Albright v. The City of Shamokin,* 277 Pa. Superior Ct. 344, 419 A.2d 1176 (1980).

Where there is good faith reliance on **valid agreements**, we must draw the line between governmental adaptability and contractual certainty in such a way as to shield such agreements from political pressure and uphold the will of the people, as delegated by them to their duly-elected representatives, declared at the time the agreements were made. This is the heart of the democratic process.

## REMEDY

Bucks County and NWRA contend that damages are the appropriate relief because reasonable alternatives to the project existed and that delay and/or cancellation of the project will not further jeopardize a Limerick operating permit.

However, a decree of specific performance may properly be entered if damages are *not reasonably ascertainable* or are *inadequate. Clark v. Pennsylvania State Police,* 496 Pa. 310, 436 A.2d 1383 (1981).[19]

---

matters submitted to it for approval by NWRA under Section 1.02 and *to approve* them as submitted or with changes consistent with federal grant requirements.

[19] Bucks County and NWRA contend that specific performance should not be awarded because it would involve the Chancellor in continuing supervision of the parties' performance. We disagree. Initially, we must presume that Bucks County and NWRA, as gov-

We agree with the trial court's holding that specific performance is appropriate in this case because the damages suffered by PECO, NP and NW are not reasonably ascertainable[20] and because damages are inadequate due to the uncertain availability of alternative water sources[21] and the resulting difficulty in receiving licensure.[22]

---

ernment entities, would resume performance of their *specific* obligations under the Construction and Operation and Water Sales Agreements subject to a final decree. Furthermore, our Supreme Court has held that, although courts generally hesitate to order specific performance where execution of the decree requires extended supervision, *see Edison Illuminating Co. v. Eastern Pennsylvania Power Co.*, 253 Pa. 457, 98 A. 652 (1916), "where the contract is one in which public interest and convenience are at stake, specific performance will be decreed even though certain oversight or discretion is required." *Id.* at 464, 98 A. at 654.

[20] The damages to PECO cannot be calculated because there is no way to accurately anticipate (1) how many days a year Limerick would be shut down for lack of a supplementary cooling water source, (2) how much time will elapse before an acceptable alternative source could be secured and (3) the cost of a new environmental impact study.

Similarly, the damages to NP and NW cannot be calculated because there is no way to accurately anticipate how long it will take to secure an acceptable alternative water source.

[21] Bucks County and NWRA have suggested that alternative water sources (1) for PECO included the Blue Marsh Reservoir, *treated* water purchased from Philadelphia or even the Schuylkill River (if certain temperature restrictions were eliminated) and (2) for NP and NW included impoundments, the proposed Evansburg Reservoir, sales from other water companies and the purchase of water from Philadelphia. However, there is nothing on the record to indicate that regulatory approval could be acquired, by either PECO, NP or NW, for any of these suggested alternative water sources.

PECO's application to the Delaware River Basin Committee (DRBC) for temporary relief during 1985 (which DRBC has not acted upon) does not support the contention of Bucks County and NWRA that PECO would be assured of obtaining an alternative source of supplemental cooling water on a long-term basis.

We further hold that, due to time limitations and unavailability, the failure of PECO, NP and NW to seek alternative water sources works no waiver of their legal rights. President Judge GARB expressed the apparent dilemma inimitably when he wrote that they "put all their eggs in one basket because it was the only basket they had." The time-consuming and rigorous nature of the regulatory permitting process, alone, is sufficient to absolve PECO, NP and NW from any obligation to seek alternative water sources if indeed they were available prior to the resolution of this controversy. Moreover, it is the burden of the breaching party to show that losses could have been avoided by the reasonable efforts of the damaged party. *State Public School Building Authority v. W. M. Anderson Co.*, 49 Pa. Commonwealth Ct. 420,

---

We hold that the trial court appropriately ruled on various evidentiary submissions whereby Bucks County and NWRA attempted to prove that permits could be acquired for suggested alternative water sources, because our review of the record reveals that no admissible evidence was offered to this end.

Although there is evidence to show that representatives of PECO made numerous statements to bond rating agencies, such as Standard and Poor, that if the project were not constructed, alternative sources of cooling water would be found, it is not surprising that PECO should attempt to paint a rosy picture for the financial community in order to enjoy a favorable interest rating in the bond market. We hold that this evidence does not refute the trial court's finding as to the uncertain availability of alternative water sources.

This being the case, we further hold that Bucks County and NWRA were not prejudiced by the trial court's denial of their petition, to depose three employees of bond rating agencies and a representative of PECO's investment banking firm, which was filed after the trial court's properly imposed deadline for discovery.

[22] Despite the contention of Bucks County and NWRA, there is great uncertainty over whether the Nuclear Regulatory Commission (NRC) would grant an operating permit for Limerick if the project were disallowed, given the fact that initial approval was given taking into consideration the project's operation.

410 A.2d 1329 (1980). We hold that Bucks County and NWRA failed to sustain their burden of showing that PECO, NP and NW could have mitigated their damages (secured alternative water sources) by reasonably diligent efforts.[23]

Bucks County and NWRA further contend that their failure to build would cause PECO no consequential damages because of regulatory problems with Limerick's operation. However, we hold that, although resulting damages might be difficult to calculate, it cannot be said that the failure to build would not damage PECO. Moreover, the argument that a degree of specific performance should await resolution of pending regulatory matters is untenable. Obviously, a project of this magnitude has to be built one step at a time. If every permit and requirement were a *sine qua non* to the other, it could never be built. The parties obviously contemplated that all permits would not be in place at the time of construction in light of the Construction and Operation Agreement's provisions regarding withdrawal in the event necessary permits are not issued.[24]

---

[23] Bucks County and NWRA argue that PECO was aware, at a relatviely early date, of strong public opposition to the project and therefore cannot be excused for failing to seek alternative sources of water. Of course, PECO had no way of knowing that the opposition would in fact cause the discontinuance of the project. Furthermore, the trial court found that any alternative for which PECO sought licensing would probably have met with the same public opposition as mounted against this project.

[24] Bucks County and NWRA's actions to date, with respect to commencement of construction, are not "wholly voluntary" merely because all permits have not yet been received. The Water Sales Agreement provides only that:

All *major* approvals required by any governmental agency for the Treatment Plant, the Point Pleasant Pumping Facilities, and the Western Transmission Facilities, must be received prior to the award of the construction contracts . . . .

ASSUMPTION OF OWNERSHIP OF NORTH BRANCH

The trial court held that, under paragraph 5, page 7 of the Water Sales Agreement, NP and NW are entitled to assume ownership of and complete the north branch transmission main and related facilities. Bucks County argues that, according to the agreement's terms, *only* Montgomery County had the *option,* upon failure of Bucks County and NWRA to pursue the project, to (1) terminate the agreement and (2) complete that portion of the project necessary to supply it with water. It further contends that President Judge GARB abused his discretion by ordering specific performance in addition to the partial takeover. We disagree. Having determined that NP and NW have standing to enforce the agreement, we further hold that they may acquire the rights of Montgomery County to complete the portion of the project intended primarily for the benefit of their consumers. Moreover, we hold that the contractual remedy, while available, is not exclusive because such an intention is not clearly set forth in the agreement. *See Bettinger v. Carl Berke Assoc., Inc.,* 455 Pa. 100, 314 A.2d 296 (1974).

---

(Emphasis added.) There is substantial evidence to support the trial court's implicit conclusion that all *major* permits were in place. Indeed, the very award of the construction contracts by Bucks County and NWRA is evidence to this end.

Moreover, Bucks County and NWRA have waived their rights under the "cancellation clause" in the Water Sales Agreement, which requires that the exercise thereof "take place within thirty (30) days after the *opening* of construction bids for the Treatment Plant, (Western Transmission Facilities) and the Point Pleasant Facilities, *whichever is last.*" (Emphasis added.) They may not forestall seeking bids for one phase of the project (theoretically allowing them an indefinite time to cancel) after they have begun construction of other phases, because the agreement provides "that *the award of the construction contracts shall be made simultaneously.*" (Emphasis added.)

236

The major procedural contention of Bucks County and NWRA is that President Judge GARB erred in denying their petitions for recusal.[25] Their petition

---

[25] Our discussion of the merits of Bucks County and NWRA's recusal petitions is equally applicable to Sullivan's similar petition.

Bucks County and NWRA also argue that (1) the claims of NP and NW should have been submitted to arbitration, (2) the trial court improperly refused them a jury trial and (3) the trial court erred by bifurcating the damage issue from the specific performance issues. We disagree.

They argue that the trial court erred by not requiring the submission of NP and NW's claims to arbitration pursuant to the arbitration provision contained in the Water Sales Agreement, which provides:

Any questions in dispute *under this Agreement* shall be submitted to a Board of Arbitration . . . .

(Emphasis added.) However, we are not here concerned with disputes "under this Agreement," but with a dispute as to whether there is an enforceable agreement at all and an attempt to obtain relief from a total breach.

We hold that the trial court, pursuant to Pa. R.C.P. Nos. 213(b) and 126, correctly bifurcated the damage issue from the specific performance issues because it was virtually impossible to determine what damages flowed from the breaches of Bucks County and NWRA.

Bucks County and NWRA also assert as error the trial court's refusal of a jury trial. The fact that the trial was an equitable action is clear from the trial court's bifurcation order which limited the hearing to "issues of equitable relief including specific performance." Pa. R.C.P. No. 1513 only provides that, in equity actions, a "court . . . *may* submit to trial by jury any or all issues of fact." Because this section also provides that "[t]he verdict of the jury shall be in the form of answers to specific questions and shall not be binding upon the court," the trial court determined that the complicated issues in this case would best be resolved by a Chancellor sitting without a jury. We hold that the trial court properly exercised its discretion. Our conclusion is not affected by the fact that NP and NW seek declaratory relief because "[d]eclaratory judgment procedures afford no independent rights to a jury trial other than those arising from the underlying action." *Brenckle v. Arblaster*, 320 Pa. Superior Ct. 87, 93, 466 A.2d 1075, 1077 (1983). *See also* 42 Pa. C.S. §7539 and Pa. R.C.P. No. 1602.

for permission to appeal this refusal[26] was denied by this Court, and our Supreme Court subsequently denied their petition for plenary jurisdiction.

Our Supreme Court has held that if, upon a review of the record, an appellate court determines that a fair and impartial trial was had, the alleged disqualifying factors of the trial judge become moot. *Reilly v. SEPTA,* 507 Pa. 204, 489 A.2d 1291 (1985). Bucks County and NWRA argue that the ownership of PECO stock by the estate of President Judge GARB's father from December 24, 1983 to July 13, 1984 and President Judge GARB's service as chairman of the interim Board of Elections of Bucks County has deprived them of a fair and impartial trial. We disagree. Obviously, any interest President Judge GARB may have had in the PECO stock owned by his father's estate could not have affected his impartiality because the stock was sold prior to the trial's conclusion and, therefore, he could not have received

---

We also hold that the trial court properly resolved this controversy in its entirety even though it began the trial without (1) formally disposing of Bucks County and NWRA's preliminary objections to NP and NW's amended complaint and declaratory judgment action and (2) providing for Bucks County and NWRA's filing of an answer and/or new matter to NP and NW's amended complaint. Pa. R.C.P. No. 126 provides:

> The rules shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding to which they are applicable. The court at every stage of any such action or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties.

Our review of the record reveals no effect on the substantial rights of Bucks County and NWRA caused by the trial court's expedited commencement of the proceedings.

These arguments by Bucks County and NWRA are meritless.

[26] President Judge GARB allowed an immediate expedited appeal from his denial of the motions for recusal pursuant to 42 Pa. C.S. §702(b) and Pa. R.A.P. 1311.

any related benefit from a decision favorable to PECO.

There is nothing in the record to indicate that President Judge GARB's service on the Board in any way affected his fairness and impartiality. President Judge GARB served on the Board pursuant to Section 301(c) of the Pennsylvania Election Code,[27] the Board's decision to place a non-binding referendum question regarding construction of the project on the ballot was made in response to various citizens' petitions and the referendum was written in neutral terms.[28]

---

[27] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §2641(c), provides in part:

> Whenever a member of the board of county commissioners is a candidate for nomination or election to any public office, the President Judge of the Court of Common Pleas shall appoint a judge or an elector of the county to serve in his stead.

[28] The referendum question read as follows:

> *NOTICE:* Your vote on the question below is not legally binding on any governmental body or official and is merely advisory.

Should Bucks County stop its participation in the construction now under way of the Point Pleasant Water Diversion Project, taking into consideration (a) the project's potential effect on the environment; (b) such termination would not affect the right of Montgomery County and the Philadelphia Electric Company to proceed with the project; (c) Bucks County most probably would be subject to pay substantial money damages as a result of breach of contract; (d) the need of Bucks County for water and water management; (e) the cost of the entire project; and (f) any other factor you believe is appropriate to this decision? This question merely provides an objective explanation of the possible consequences of Bucks County's withdrawal from the project. Section (b) merely explains that Montgomery County and PECO could simply build the project without Bucks County and Section (c) merely alerts the electorate of the probable (not certain) financial consequences of a breach, *if* such were found.

## SULLIVAN'S COMPLAINT

Sullivan contends that he is a third-party beneficiary, as a taxpayer, to the Construction and Operation and Water Sales Agreements and therefore entitled to sue for recovery of damages to Bucks County (costs of attempting to stop the project, litigation and construction already completed) from its Commissioners and the NWRA Board members and/or completion of the project and the acceptance by Bucks County of the benefit originally contemplated. The trial court granted the preliminary objections of Bucks County and NWRA to Sullivan's third amended complaint, which raised its failure to state a cause of action, and dismissed it in its entirety. The court, however, recognized Sullivan's standing as a taxpayer with respect to this lawsuit and allowed him to be considered a party to the complaints of PECO, NP and NW to the extent that he seeks the same relief.

We agree with the trial court's conclusion that despite his standing to bring an action, Sullivan failed to state a separate cause of action in his third amended complaint.[29]

---

[29] Sullivan's complaint contains several allegations separate and apart from those charged by PECO, NP and NW.

First, Sullivan's complaint alleges that Bucks County lacks authority to take over the project, under Section 18(A) of the Act, 53 P.S. §321(A), relying on *County of Mifflin v. Mifflin County Airport Authority*, 63 Pa. Commonwealth Ct. 56, 437 A.2d 781 (1981). However, the trial court correctly distinguished that case where, *unlike here*, (1) provisions in outstanding trust indentures financing an airport limited the County's right to acquire the Authority's assets to its failure, neglect or cessation of operation and (2) compliance with the Local Government Unit Debt Act, Act of April 28, 1978, P.L. 124, *as amended*, 53 P.S. §§6780-1—6780-609, was not shown. This is not a case where a municipal authority is foisting its debts upon the governing body, without its consent, in

"The right to amend should not be withheld where there is some reasonable possibility that amendment

violation of Section 14 of the Act, 53 P.S. §317. Here, Bucks County's *choice* to take over the project under Section 18(A), and assume the related debts and obligations, is unimpeded.

Sullivan's complaint also seeks to have the implementation of Ordinance No. 59 enjoined, alleging that the Bucks County Commissioners intend to thereby terminate the project and breach their contractual obligations. However, we hold that the trial court correctly refused to enjoin implementation, pointing out that (1) Bucks County's assumption of "all obligations" under Section 18(A) would include the contractual obligations and all liabilities for breach, (2) it is presumed that municipal officers act properly for the public good, *Robinson v. Philadelphia*, 400 Pa. 80, 161 A.2d 1 (1960), and, absent contrary proof, courts will not interfere with administrative discretion and (3) courts do not assess the *wisdom* of statutes. *Mastrangelo v. Buckley*, 433 Pa. 352, 250 A.2d 447 (1969).

Sullivan's complaint further alleges that implementation is barred by Sections 4C, 12 and 13 of the Act, 53 P.S. §§306C, 315 and 316. The trial court correctly rejected this allegation.

Section 4C provides that the Authority shall have no power to pledge the credit or taxing power of the Commonwealth or any political subdivision, nor shall any of its obligations be deemed to be obligations of the Commonwealth or of any of its political subdivisions. However, this is not a case of the Authority pledging the credit or taxing power of the County or the Commonwealth but rather a matter of the County opting to assume the assets and liabilities of the Authority. Construing this section as urged by Sullivan would render Section 18(A) totally meaningless.

Section 12 provides in relevant part:

That the Authority shall not be authorized to do anything which will impair the security of the holders of the obligations of the Authority or violate any agreements with them or for their benefit.

NWRA is doing nothing in the matter before us. Here, we are concerned with Bucks County's actions under Section 18(A) of the Act.

Lastly, Section 13 provides that "the Commonwealth" will not alter or limit the rights and powers of the Authority in any manner which would be inconsistent with the continued maintenance and operation of any project (to which a Federal agency has contributed funds), or the improvement thereof, or which would be inconsistent with the due performance of any agreements

can be accomplished successfully." *Otto v. American Mutual Insurance Co.*, 482 Pa. 202, 205, 393 A.2d 450, 452 (1978). However, there are some "cases where it is clear that amendment is impossible and where to extend leave to amend would be futile." *Id.* Although, unlike PECO, NP and NW, Sullivan seeks recovery from the Bucks County Commissioners and the NWRA Board members, it does not appear that his complaint could be amended to state a cause of action for this *special* relief.[30] We, therefore, hold that the trial court did not abuse its discretion by ordering that Sullivan be considered a party to the complaints of PECO, NP and NW.

We hold that there is substantial evidence in the record to support the trial court's findings and that it committed no abuse of discretion or error of law in its adjudications.

Affirmed.

---

between the Authority and any such Federal agency. Obviously, nothing is contemplated by the "Commonwealth" in the matter before us.

Sullivan's complaint also alleges a violation of his rights under the Fifth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983. We, like the trial court, are unable to divine any violation of constitutional rights caused by the enactment of Ordinance No. 59.

Finally, there has been no violation of PA. CONST. art. IX, §9, which applies to purely private enterprises, because NWRA is a creature of Bucks County.

[30] After three amendments, the allegations of Sullivan's complaint charging fraud and improper motive, which are couched in hypothetical and speculative terms, are insufficient to justify judicial review of Bucks County and NWRA's discretionary acts. *Larrecq v. Van Orden*, 21 Pa. Commonwealth Ct. 623, 627-28, 346 A.2d 922, 925 (1975). The mere refusal to proceed with the project, even after financial investments have been made, does not necessarily establish improper motive. Moreover, we will not question the efficiency or financial judgment of municipal officials regarding a construction contract where reasonable men could differ as to the wisest course to follow. *Id.* at 628, 346 A.2d at 925.

242

## ORDER

The orders of the Court of Common Pleas of Bucks County, No. 83-8358 dated February 27, 1985 and No. 83-8358-05-5 dated May 29, 1984, are affirmed.

Judge COLINS dissents.

Judge PALLADINO did not participate in the decision in this case.